Mia Westbrooks, together with my co-counsel, Mark Westbrooks, we represent the appellants, the eight children of Rafael Acano, in their suit against Continental Airlines, Apolli, for proximately causing the death of plaintiff's decedent. The threshold issue in this case, Your Honor, turns on the duty to witness the medical emergency. I will be addressing the first issue related to causation. I will reserve time for my co-counsel to address the additional issues regarding the misability of the expert who was struck at the trial court level. Plaintiffs are asking the court for relief here today to reverse and remand for the district court his error in striking the plaintiff's expert in whole, based on the grounds of a lack of reliability and a Daubert standard. The trial court abused its discretion in striking the plaintiff's expert in full, misunderstanding and misconstruing that there were multiple breaches by defendants in their duty of care. Well, the threshold is, to what extent can you establish here, which you weren't able to establish in the trial court, that this is based on scientific facts? Yes, Your Honor, the plaintiff's expert gave opinions that were superfluous and not material to the case. That was the abuse in discretion. Plaintiffs have met their burden if you focus on the breach of duty of care that gave rise and proximately caused the decedent's death. Okay, but we're talking about whether there was an abuse of discretion in excluding this witness. In other words, finding that he was not Daubert qualified. Yes, Your Honor, and my co-counsel will be addressing that standard. What is critical for the court to understand is that the first breach by defendants that proximately caused plaintiff's decedent's death was the fact that there were violations of the airline's own in-flight policies, violations of FARs and CFRs that required the flight attendant, James DeCicero, to stay at his post and witness this cardiac event. From a causation standpoint, Your Honor, he... Well, you're assuming that if he had stayed at his post, he would have witnessed the cardiac event, but if you look at page 14 of the decision below, it seems that it's a... There's a factual recitation here that really cannot be denied, and that is that there is no evidence concerning precisely when she entered the laboratory, how she felt at the time, what actions she took while she was in the laboratory, when her illness began, and how long it lasted. And the facts of the case seem to indicate that she went in there to use the laboratory for standard purposes, not because it's a cardiac event, given the state she was in and particularly her undergarments at the time. Your Honor, the... So there was no witnessing of a cardiac event here. Your Honor, the evidence is that there was a duty to witness this person who was alive and her heart was beating at the time that she entered the lab, but for the breach and the flight attendant leaving his post, he would have witnessed the event, he would have seen her enter the lab, he was required to remain present until she left the lab, and then and only then leave from his jump seat at the... Back aft of the plane and move forward up. The second breach that had occurred that gave rise, approximately, caused this death. Was that flight attendant assisting another family in need, a family that needed special attention in exiting the plane? The federal rules require that he stay at his post, and if there were a family that needed attention and needed to deplane, under federal law, he is required to stay at that post for this very reason. You're assuming that the deceased woman, and certainly this is a tragic circumstance, but you're assuming that as she went into the bathroom, she was having some kind of a heart event, and that if she could have found a flight attendant at that point, she would have made contact or communicated her distress in some way? No, Your Honor. He was required, and all three flight attendants, as well as the two pilots, were required under federal regulations to make sure, before they deplaned, that all fair-paying passengers were off the plane. He broke federal law. Not only did the one flight attendant break federal law in allowing this person to be in the lab unmonitored while he left his flight seat, he also, in addition, broke federal law, as well as the second flight attendant, by leaving the aircraft to help that mother with her child. Those policies, those laws are put into effect for this very reason, because there is a duty by this very relationship that this is a fair-paying passenger, and federal laws require, it is critical to understand that this was the last flight of the day. The plaintiff at 610 made it safely and alive to the gate. She was not, and the record is very clear, and we have established the fact that her life, more likely than not, could have been saved had the airline simply followed federal law and utilized the life-saving procedures. They had a duty to know that there was a passenger in that lab. They failed to comply with that duty. The reason, the first breach that occurred that approximately caused the decedent's death, is that the flight attendant did not remain at the back of the plane, therefore, he didn't know. Second, the two flight attendants de-planed, along with the passenger. That's another reason why they never knew that this passenger was in the lab. I think the thrust of the decision below that there was no causation here, there's no medical causation, rather than there was a breach of a mandatory statutory duty required by the FAR as cognizable under Arizona state law, aren't we really looking at the issue of whether the district judge's decision that there was no medical causation here should be affirmed? Your Honor, that's a very important point, and I urge the court to not confuse myocardial infarction with sudden cardiac arrhythmia. Would you answer my question, though? Wasn't the thrust of the decision below medical causation, rather than whether or not there was a breach of a mandatory statutory duty? No, Your Honor. The district court erred and abused his discretion because he failed to look at the facts as well as apply the law. The causation elements have been met. There is a causal nexus, a close proximity to the defendant's multiple breaches. Unfortunately, the district court focused on the final breach, the failure of the airline to resuscitate. He didn't focus on the multiple breaches prior to the last breach. The reason why there's not sufficient, in some cases, peer-reviewed literature is that these events, these sudden cardiac arrhythmias, which typically can be reversed or never even occur when they are witnessed, is that most of the time they're unwitnessed. Plaintiff's decedent couldn't have been in a better place or had a better opportunity for survival. The American Heart Association clearly indicates that if you defibrillate or even allow CPR, make a phone call, follow the standard four-step chain of survival within the first minute of when the heart stops, and plaintiff's decedent was alive at the very time the first breach had occurred, and Mr. DeCesario left the lab and failed to witness her, had he simply done his job and stayed, manned that station and watched her, monitored her, witnessed her, she had over a 90 to 93 percent chance of being resuscitated. And that's an event. That sounds awfully speculative to me. Your Honor, if you take a look at the records, as far as sudden cardiac arrhythmia, peer-reviewed literature does confirm that when you have a... I accept what the literature says, but what I have a hard time accepting is that you have met the requirements to establish causation in this case by referring to those documents. Had she been outside in the hallway and had her final fatal arrhythmia and it had been witnessed, they could have brought her back, more likely than not, by doing CPR, by calling by doing the defibrillator. It's called the shock of life for a reason by the American Heart Association. Because it brings that fatal arrhythmia back so that the heart can function properly. And that is the causation there. They had a duty to witness, they had a duty to administer appropriate aid, to make the phone call, which is step one, according to the four-step chain of survival. Step two, to administer CPR, which these people were very well trained to do. Step three, use the defibrillator, which absolutely would have brought her back. Again, her chance of survival at that stage, had they simply witnessed this event within the first minute of utilizing the defibrillator, was a 90 to 93 percent chance of survival. The subject of literature has come up, and as I understand it, your associate is going to be arguing that, is that right? Yes. I'll reserve the additional time for co-counsel. May it please the Court, Justices. If I could introduce yourself for the record, please, Mr. Marks. Mark Westbrooks, representing appellants. To answer Justice Miller's question, it's what's important in this case is that not only do the federal aviation regulations govern what flight attendance duties are on the airplane, but Continental has an in-flight policy. This is excerpts of record 1408, and in that particular policy, it informs that flight attendance, if you have children or passengers traveling with children, they must remain in their seat until all other passengers are deplaned. They have a duty to monitor, and this is what we call a, what they call an RON flight. If it's an initiated flight, first flight of the day, last flight of the day, they have special regulations. They must check all lavatories in all rows. What we know in the case, and this is an issue that is a summary judgment issue more than an, and I'll address the causation issue, is the fact that we, the undisputed evidence in the case is that the deplaning process took one to two minutes, that Ms. Cano did not enter the lavatory because the two lavatories were occupied. In the brief, I even set out some, some reference where the trial court mentioned the hypothetical saying both of these lavatories were occupied by two children until after the plane was parked at the gate, no one could get in the lavatories. Ms. Cano goes to the lavatory. She was supposed to pass two flight attendants under federal law and under the, and under Continental's express written policy. This flight attendant left the plane in violation of. You're arguing duty again and breach of duty, but it seems to me the thrust, I'll say it to you, as well, it seems to me the thrust of the decision below was based on medical causation. Yes. And Dr. Lee's opinions were, were so speculative that they just did not pass muster under 702 or the, the Dauber test. And I'd be glad to shift gears to that subject and come back on the other issues. Essentially what we have in the medical literature, before we get to, first of all, the trial court was critical of Dr. Lee's timetable. Dr. Lee did not voluntarily submit that timetable as part of his initial report. He was asked in the deposition about his opinions. And he was asked, do you have an opinion as to time of death? One of many opinions. He said, yes, I do. He was even asked to take a pen and calculate the time, which he did. That opinion is what the court was critical of. But our point is that we don't need, without Dr. Lee's timetable, we have to look at the statistical chance of survival and apply those to the facts. Ms. Cano would have been discovered within three to, within two to four minutes after she entered the lab and would have been within a statistical chance of survival, irrespective of Dr. Lee's opinion. And if I could address some of the peer literature. First of all, what the court has to understand is that there are generally no statistics available for out-of-hospital survival for ventricular fibrillation. The reason is these are healthy individuals. Counsel, the district judge did ask for all of the medical literature upon which Dr. Lee was predicating his opinions to be produced. And there was a significant amount of that. But from the record, it appears as though it came down to two articles, the Cal State Fullerton article, which was published in the Daily Titan or whatever it is,  Well, not exactly, Your Honor. I know the court referenced the Daily Titan article. The articles that are particularly relevant are the De Luna article. And where we end up when you review this literature is that there is peer review support that 91 percent of the time, all ventricular fibrillation is 91 percent, 0.7 percent of the time, is preceded by some period of VTAC. And the peer literature says it can be from seconds to minutes to days. The court went through that De Luna article pretty carefully, which was based on a number of patients dying while they had a Holter monitor on. They were ill patients with Holter monitors, and it actually says in the slip notes that they were alive. Let me finish my question. I'm sorry, Your Honor. As I understand it, the district court, after reviewing the De Luna article, very carefully said that the timelines that Dr. Lee used, either under his initial fear factor theory due to the lights being off, being then changed to a confusion theory when he realized that the lights in the labs are not turned off, timelines under either of those theories were not buttressed by what was in the De Luna article. But, Justice Miller. Judge Miller will be fine. I'm sorry. Judge Miller, the timetables are at a period of time outside of the relevant period of time that Ms. Kano should have, through the exercise of reasonable care, been discovered. Jennifer Ferguson, flight attendant, testified that they checked the labs, one of the last things they do at deplaning, one to two minutes after deplaning. That would have been within the statistical five to seven minutes in the O'Rourke article. There's a 7 to 10 percent diminished opportunity to resuscitate. And where it exceeds 50 percent is between five to seven minutes. If a person is not discovered and administered the four-step chain survival, then the probabilities are less than 50 percent. So my point to this Court, and actually the trial court acknowledged this, and I've quoted it in the brief, but did not acknowledge it in the opinion, is that whether Dr. Lee offers an opinion that she lived 25 minutes, 30 minutes, whether he gives an opinion about what happened to her in her immediate afterlife is irrelevant to the issue at hand. It doesn't affect the material issue at hand. And that's the second prong of the Daubert test. It seems to me the whole key is not what happened afterward in the hospital or anything. It's the timing in which she could have been discovered and what could have happened at that stage causally. I think cause is the real issue with all three of us. And so it seems to me that the key is that she had to be discovered within certain minutes in order for it to have been a causally related situation. Correct. And had everything been, had the flight attendants performed as they're required to perform by their own in-flight manual, by their own testimony, within one to two minutes, they would have opened the lab. So we have two scenarios. Two minutes of what? Deplaining. We have two scenarios. If Mr. Desario was standing there outside of each lab, he would have encountered her, he would have observed her, probably would have communicated with her. She may have asked, can I use the lab? That didn't happen. So there's a monitoring opportunity that was missed. Okay. Ironically, because it did happen. But is that a breach of some duty, that particular event? Is that a breach of a duty? Absolutely. Under the Federal Aviation Regulations, and it's at Excerpt of Record 1408, cabin crew members are required to remain on board until all customers have deplaned, and then cabin crew is required to check lavatories and all rows prior to, for customers prior to deplaning. It's in their own policy. But ironically, because Mr. Desario left the plane and she wasn't witnessed going into the lab, that placed her in a situation where a flight attendant wouldn't say, well, gee, we don't want to open the door, she needs her privacy, let's just leave her alone. No. According to Ms. Ferguson's testimony, one to two minutes, check the lab. There's an issue of fact. Continental wants to say check the lab means just look at the sign and see if it says vacant. An expert witness flight attendant who's an airline purser who trains flight attendants says no, no, no, that means physically open the lab and make sure they're not in there. So the point we're trying to assert to this Court, and the trial court did acknowledge it at the hearing, but not through its order, is that Dr. Lee's opinion, first of all, the trial court did say there was, some of the articles did tangentially support, and I think what the Court was telling us was there is evidence that there's a 92% chance that there are premonitory symptoms. The question is the timeline. If we don't get to the timeline, if they had, if they breached the duty to monitor, they breached the duty in their own policy to open the lab within one to two minutes, now we've got an issue of fact for the jury, for the jury to decide. The proper remedy under a Daubert challenge. You know, time-wise, you've got to figure in when she went into the lab, too. We have that in the record. We have the most detailed account of when she went into the lab. I'm not figuring. You keep talking one to two minutes. Well, that's, that has to be added to the time when she went into the lab. When she went into the lab, we know she urinated because of the autopsy. We know she didn't go into an immediate final arrhythmia, as the defendants would suggest, she fell to the floor. We don't know. So, but assuming arguendo, that she did fall to the floor, under the O'Rourke article, which is in the record, excerpt record 1341, a 7 to 10 percent diminished per minute chance of survival, even if you reject Dr. Lee's opinions, which are not, they don't fit, they're not necessary to the case, then we still have an issue of fact. So it's an abuse of discretion to shift gears to that issue. And in the case of the trial, the trial court had an opinion, striking the testimony in full as an all be it all, that this doctor asked in a deposition, handed a pen and a notepad and said, tell us when the time of death was. And he did the calculation. And because he gave an answer of his opinion and offered that conclusion, that should not render his entire testimony inadmissible. And to go further with that, the trial court did find that the articles that were submitted did tangentially support. They just didn't say 10 to 25 minutes. But they did say 92 percent chance of premonitory symptoms. And out of those 92 percent chance that have the period of ventricular tachycardia before they go into fibrillation, 62 percent of those, more than half, have fluttering and other premonitory phases before they go into fibrillation. All right. That final phase. Thank you, counsel. Your time has expired. Thank you, Your Honor. We'll hear from Continental Airlines. May it please the Court, Bill Boyce on behalf of Appalachian Continental Airlines. I'd like to begin with Judge Miller's question, which is, we are here on causation. We did not seek summary judgment with respect to the standard of care. I think for purposes of today, I would have to concede that there is a fact issue with respect to whether or not the standard of care was satisfied. There was expert testimony, expert affidavits, expert reports on both sides of whether or not a standard of care with respect to checking the lavatory was satisfied, whether that means looking at the indicator on the door versus opening it up. So the direct answer to your question, Judge Miller, we're here on causation. That's the only thing that we moved for summary judgment on that brings us here today. Turning to causation, I think that it is important to focus on what is known and what is not known. And I think what that leads to is a conclusion, that there is no non-speculative basis for concluding that Ms. where a check or visualization of her would have made any difference. And I think it's important to zero in particularly on what we know and what we don't know. There is not known in this record the time that she went into the lavatory. There is testimony that she was observed standing up in her seat after the plane got to the gate. Dr. Lee testified that he thought she went into the lavatory at 6.15 p.m. Frankly, I think when the court looks at that specific deposition testimony, the court will see that that number is pulled out of thin air. There's not a basis to say where that number comes from. He further guesstimated or speculated, Dr. Lee did, that the plane was one-third to one-quarter empty or something like that at the time that she worked her way back from seat 23A to the real lavatory. But I think what the court will see, looking at all the deposition testimony, including that of the flight attendants, that it is not known when she went into the lavatory. We do not know how long it took to clear the plane out. Flight attendant Ferguson testified that she did not have a specific recollection of the time it took to get everybody out of this MD-80 aircraft. And I think if you focus on those two facts being absent, that establishes why so much of what's been discussed so far is speculation about what could have happened, what should have happened. And I would like to zero in, Judge Hugg, on your focusing on another key question here, references made to there should have been a lavatory check within one to two minutes. And you properly asked, one to two minutes of what? I think what the court will see when the court looks at the deposition testimony of flight attendant Ferguson, which is at pages 233, 234, and 235 of the plaintiff's record excerpts, the one to two minutes reference refers to a time period starting after all the passengers are off the plane. But because we don't know how long it took for the plane to empty this day, because we don't know when Ms. Cano went into the laboratory, we are back to the realm of speculation about whether or not it would have made any difference. And there's been, frankly, some shifting going on here between what was positions that were taken or arguments that were made in the district court versus where we are here now in the court of appeals. I do not understand from the trial court briefing or from the district court opinion, I do not believe that there was any disagreement on the plaintiff's side, below at least, that Dr. Lee's testimony was not necessary, that somehow a fact issue could be generated without Dr. Lee's testimony. And I think that puts Dr. Lee's time frame that he generated front and center. And the court has or will see the district court opinion that very, very thoroughly goes and analyzes each key component leading up to that time frame, the postulated set stages leading up to full cardiac arrest, point one. Point two, the time periods that Dr. Lee assigned to those stages. And then number three, the hypothesized confusion that, according to Dr. Lee, was so profound and so immediate that it precluded Ms. Kano from making any noise in the laboratory, knocking on the door, opening the door, pushing the call button, calling for help. I think when the court focuses on Dr. Lee's time frame, that really highlights the weaknesses of the causation theory here, because the district court did, frankly, a fairly remarkable job of zeroing in on exactly what the court was concerned about and asking for specific support. The court will find in volumes 6 and 7 of the plaintiff's record excerpts the slip sheets that the court prepared with the very specific questions, identify for me every article that supports the stages, identify for me every article that supports the timing of those stages, and identify for me every article that supports the hypothesized confusion. And it really does boil down to essentially the DeLuna article, I think, as the court pointed out, and then the newspaper article from the Daily Titan student newspaper at Cal State Fullerton, which is really the Daily Titan article is the only one that looks like it very straightforwardly says that here are certain stages, but it's a student-authored newspaper article. I don't think it comes close to being a peer-reviewed medical journal type of article. And what I think the court will see upon examining the DeLuna article is that time frames very widely, that stages vary widely. There may be some persons in whom there is a certain amount of ventricular tachycardia, the rapid heartbeat that precedes ventricular fibrillation, which is where the heart stops pumping. There may be other circumstances where patients, this is from the Holter monitor study, where they go straight into ventricular fibrillation, bottom line. Under these circumstances, any attempt by the plaintiff to hypothesize some 30 to 40-minute window during which Ms. Kano could have been resuscitated if found is unduly speculative. That's the center of what the district court ruled on. That's what we're here on this morning. That's, I believe, a proper basis for affirming the district court's opinion. And I think what's also remarkable here, too, is that, you know, this was not done precipitously by any means. The district court gave the plaintiffs multiple opportunities to explain the links, to explain the timing as to how this would have made a difference. Under the very unfortunate and unique circumstances of this case, it's obviously hard to point to some kind of analogous case. I'm not aware of any specifically factually similar case. But I do want to direct the Court's attention to one case in particular. This is under Arizona State Court Law, LOHSE versus Faultner, F-A-U-L-T-N-E-R, 860 Pacific 2nd, 1306. I assume that's in the brief. It is not in the brief, Your Honor. It is not? It is not in the brief. Does counsel have a copy of that same case? No, I have not given counsel a copy of it. Do you have a rule in our court that you should fill out before you leave the courtroom a gum sheet and triplicate and also serve your opponent with the details of that case? I will comply with that rule, Your Honor. The deputy clerk will help you with that. Yes, Your Honor. I will comply with that rule. And by way of a brief factual discussion of it, if the Court will hear it, it was a case where there was a discussion of that there was a claimed breach of a standard of care because a logging company did not have monitors, fire monitors around the work site looking for potential outbreaks of forest fire. The contention was that had there been monitors there, a fire that ultimately did break out and consume a certain number of acres could have been seen and addressed more quickly, and the Court concluded that that was too speculative. I think that's the closest analogy that we've been able to locate in that regard. Is the reason that the district judge included Dr. Lee's testimony is that he was unqualified? No. No, Your Honor. Dr. Lee was a retired cardiologist, and I don't the basis for the motion for summary judgment for the challenge was not his qualifications. So it's really a disagreement with his opinion? It is a belief that his opinions are unduly speculative and not supported. Why isn't that a jury question? I think when you get to the realm of complete speculation, it ceases to be a jury question. And obviously there's – it would be difficult for any court to draw a bright-line rule and say beyond this there's too much speculation. But I think when the Court looks at all the circumstances in this case as reflected in the trial court briefing, the conclusion is that the district court here acted within its broad discretion under Rule 702 and under Daubert by striking this testimony. And I think that's particularly highlighted if the Court compares Dr. Lee's written report versus his deposition testimony, which is a fairly dramatic turnaround. In Dr. Lee's written report, which appears at page 831 of the record, the plaintiff's record excerpts, he opined that it is unknown how long Ms. Cano endured the various symptoms leading up to cardiac arrest. He also opined at page 831, during most cardiac arrhythmias, patients are able to make it known to others present that they are having these problems. Contrast that with the deposition testimony appearing at pages 747 through 787, roughly, of the plaintiff's excerpts. And I think the Court will see that it's flatly contradictory. And I think that that's where – However, something that surely could be brought up with by cross-examination and the jury could consider that, but does that really qualify as a Daubert elimination of the witness? I think, Your Honor, that when the – I think the answer to your question is yes, it does fall within a district court's discretion under Daubert, because at a certain point it becomes so speculative when you take the contradictions plus the lack of specific medical journal support for the stages or for the timing of those stages, plus the fact that there are these unknown time factors, such as when did she go into the lavatory, how long did it take the plane to be completely emptied and those sorts of things. I think when all of these things are put together, it falls squarely within the district. Why wouldn't the timing be a question for the jury? I'm sorry? Why wouldn't the timing be a question for the jury? Because there's not evidence from which the timing can be extrapolated. I think that's where what is not known in this record that it was partially full, three-quarters full, or one-quarter full still. Wouldn't that have something to do with the timing that could be argued? I think when there is no basis for estimating, and I don't believe that there is in this record, what we are left with is undisputed facts that Ms. Cano did not seek help, that she was found in circumstances in the lavatory, on the commode with her undergarments down, all of which point to immediate sudden death that would have made any asserted breach of a duty to find her, not a causation, not a causal link leading to her death, it wouldn't have made a difference. I think under the circumstances of this case, based on what is established and the facts that simply are not in this record, after exhaustive depositions of all the flight crew members and experts and so forth, it ceases to be a jury question. I think I come back to this notion that the standard with respect to Daubert here, and we're talking about expert testimony to establish the timing here, is a question of abuse of discretion. I think it gets down to minutes, doesn't it? I mean, it gets down to the minutes that she was in there, and a question of whether at some point it would have been soon enough to have done something with defibrillation. But we don't know what exactly the time is, and why isn't the time a jury question? A couple of answers to your question, Judge. Number one, I think bearing in mind that we're under a standard here pursuant to Arizona law where it's not enough to show merely a possibility that it would have made a difference, that it would have been a probable difference, I think that addresses part of your question. We can speculate about what would have happened if things had happened in a different time frame, but at some point a speculation, maybe that's a possibility that it would have made a difference, but it's not the probability that Arizona law is looking for. And I think, too, that the jury instruction would say probability, so the jury would have to find it was probable. There probably would be a jury instruction with respect to proximate cause under Arizona law. But I think the Losi case identified earlier is an example where at some point we are in the realm of speculation to such a degree that it ceases to be a jury question and becomes an appropriate matter for summary judgment. And a part that's significant to me in looking at the case law is that I view this in terms of an abusive discretion. Did this district court act within its discretion by striking this testimony? And that abusive discretion standard applies even in the context of a motion for summary judgment. The Ninth Circuit's Lust case, for example, makes that very clear. So the bottom line here is I view this as a question of an abusive discretion, and under these circumstances I think the district court acted amply within its discretion by refusing to consider the speculation that was proffered by Dr. Lee in terms of a timeline to try to create a window of time long enough, up to 30, 35, 40 minutes, where an earlier intervention supposedly would have made some kind of difference. If the Court has no further questions, I'll ask the question. No further questions. Thank you, Counsel. The case just argued will be submitted for decision, and the Court will take its morning recess. Thank you.
judges: Hug, O'scannlain, Miller